# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL KIM, et al., | 1:16-cv-01656-LJO-SKO |
| Plaintiffs, | MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS (Doc. 19) |
| v. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

## I. **PRELIMINARY STATEMENT TO PARTIES AND COUNSEL**

Judges in the Eastern District of California carry the heaviest caseloads in the nation, and this Court is unable to devote inordinate time and resources to individual cases and matters. Given the shortage of district judges and staff, this Court addresses only the arguments, evidence, and matters necessary to reach the decision in this order. The parties and counsel are encouraged to contact the offices of United States Senators Feinstein and Boxer to address this Court's inability to accommodate the parties and this action. The parties are required to reconsider consent to conduct all further proceedings before a Magistrate Judge, whose schedules are far more realistic and accommodating to parties than that of U.S. District Judge Lawrence J. O'Neill, who must prioritize criminal and older civil cases.

Civil trials set before Judge O'Neill trail until he becomes available and are subject to suspension mid-trial to accommodate criminal matters. Civil trials are no longer reset to a later date if Judge O'Neill is unavailable on the original date set for trial. Moreover, this Court's Fresno Division randomly and without advance notice reassigns civil actions to U.S. District Judges throughout the nation to serve as

visiting judges. In the absence of Magistrate Judge consent, this action is subject to reassignment to a U.S. District Judge from inside or outside the Eastern District of California.

## II. <u>INTRODUCTION</u>

This matter involved Defendant's March 27, 2017, motion to dismiss pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) for lack of subject matter jurisdiction. Doc. 19. On April 10, 2017, Plaintiffs filed an opposition. Doc. 21. On April 17, 2017, Defendant filed a reply. Doc. 23. For the following reasons, Defendant's motion is granted, and Plaintiffs' complaint is DISMISSED.

## III. <u>FACTUAL BACKGROUND</u>

The following facts are drawn from the complaint and filings in this matter, and are accepted as true only for the purpose of this motion to dismiss. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). On August 14, 2015, Dragon Kim and Justin Lee, both fourteen years of age, were camping with Dragon's parents, Plaintiffs Daniel and Grace Kim, and Dragon's sister, Plaintiff Hannah Kim, at the Yosemite Valley Upper Pines Campground in Yosemite Valley National Park. Doc. 1 at ¶¶ 2-6, 15-16; Doc. 19-1 at 2. At approximately 5 a.m., the tent in which Dragon and Justin were sleeping was struck by a limb which fell from a California black oak ("the Subject Tree"). Doc. 1 at ¶ 16. Both boys died of crushing injuries sustained as a result. *Id*. at ¶ 17-18. There were no warning signs placed near the Subject Tree. *Id*. at 22. Plaintiffs bring claims for wrongful death and negligent infliction of emotional distress against Defendant, alleging that Defendant was negligent in maintaining the Subject Tree and the area around it, and that Defendant knew or should have known of a defect in the tree . *Id*. at ¶¶ 1, 20.

## IV. <u>STANDARD OF DECISION</u>

A motion to dismiss under Rule 12(b)(1) challenges the subject matter jurisdiction of the Court. Federal courts are courts of limited jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994). A "court of the United States may not grant relief absent a constitutional or valid statutory grant of jurisdiction." *United States v. Bravo-Diaz*, 312 F.3d 995, 997 (9th Cir. 2002). "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively

appears. *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). "When subject matter jurisdiction is challenged under [Rule] 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Tosco Corp. v. Communities for Better Env't*, 236 F.3d 495, 499 (9th Cir. 2001) *abrogated on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77 (2010). No presumption of truthfulness applies to a plaintiff's allegations when evaluating the merits of jurisdictional claims. *Thornhill Pub. Co. v. General Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

A Rule 12(b)(1) motion may make facial or factual attacks on the existence of jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1034, 1039 (9th Cir. 2004). A facial attack contests whether the allegations in the complaint are sufficient to invoke federal jurisdiction, while a factual challenge "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Id.*; *see also Thornhill Publ'g Co. v. gen Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

When the existence of subject matter jurisdiction is at issue, a court "is not restricted to the face of the pleadings." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). A court may rely on evidence extrinsic to the pleadings and resolve factual disputes relating to jurisdiction. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). In doing so, a court may "rely on affidavits or any other evidence properly before the court." *Id*. When considering items outside the pleading, the court resolves "all disputes of fact in favor of the non-movant." *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir. 1996).

## V. <u>ANALYSIS</u>

### A. <u>The Federal Tort Claims Act</u>

"It is elementary that the United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit. A waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *United States v. Mitchell*, 445 U.S. 535, 538 (1980). Without a waiver of sovereign immunity, a federal

court lacks jurisdiction where the United States is sued. *Tobar v. United States*, 639 F.3d 1191, 1195 (9th Cir. 2011).

The Federal Tort Claims Act ("FTCA") allows the government to be sued "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). It waives the United States' sovereign immunity for tort claims caused by negligence on the part of government employees acting within the scope of their employment. *Terbush v. United States*, 516 F.3d 1125, 1128 (9th Cir. 2008). The FTCA, however, includes a number of exceptions to this otherwise broad waiver of sovereign immunity. *Id*. at 1129.

Among the limitations on the FTCA's immunity waiver is the discretionary function exception, which bars claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved by abused." 28 U.S.C. § 2680(a). The discretionary function exception reinstates sovereign immunity in situations where "employees are carrying out governmental or 'regulatory' duties." *Faber v. United States*, 56 F.3d 1122, 1124 (9th Cir. 1995). The exception is limited to discretionary acts, that is, acts "involv[ing] an element of judgment or choice." *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988). "The purpose of the discretionary function exception is to protect the ability of the government to proceed with decisionmaking in carrying out its unique and vital functions without 'second-guessing' by the courts as to the appropriateness of its policy choices." H.R. Rep. No. 1015, 101st Cong. 2nd Sess. 134 (1991).

The two part *Berkovitz* test is used to determine if a claim is subject to the discretionary function exception. *Terbush*, 516 F.3d at 1129. In the first step, the court determines whether the government's "actions involve an 'element of judgment or choice.'" *Terbush*, 516 F.3d at 1129 (quoting *United States v. Gaubert*, 499 U.S. 315, 322 (1991)). "This inquiry looks at the 'nature of the conduct, rather than the status of the actor' and the discretionary element is not met where 'a federal statute, regulation, or policy

specifically prescribes a course of action for an employee to follow.'" *Terbush*, 516 F.3d at 1129 (quoting *Berkovitz*, 486 U.S. at 536). There can be no discretion if a statute or policy mandates a course of action and an employee "has no rightful option but to adhere to the directive." *Berkovitz*, 486 U.S. at 536; *Navarette v. United States*, 500 F.3d 914, 916 (9th Cir. 2010) ("An agency lacks discretion where a statute or policy directs mandatory and specific action, and an employee has no lawful action other than to comply with the directive.").

If the conduct satisfies the first step and involves an element of choice or judgment, a court must next consider "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. "[O]nly governmental actions and decisions based on considerations of public policy" are protected. *Id.* at 537. "The decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." *Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998). "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

When it invokes the discretionary function exception, the government "bears the burden of proving the applicability of one of the exceptions to the FTCA's general waiver of immunity" because such an exception "is analogous to an affirmative defense" to correctly place the burden on the party which benefits from the defense." *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992). "Although the plaintiff bears the initial burden of proving subject matter jurisdiction under the FTCA, 'the United States bears the ultimate burden of proving the applicability of the discretionary function exception.'" *Faber*, 56 F.3d at 1124 (quoting *Prescott v. United States*, 973 F.2d 696, 701-02 (9th Cir. 1992)).

If the government successfully shows that that challenged act or omission satisfies both steps of the *Berkovitz* test, then the discretionary function exception applies, and the federal courts lack subject

matter jurisdiction. *Bailey v. United States*, 623 F.3d 855, 860 (9th Cir. 2010). Even if the "action or omission constituted an abuse of discretion or was a wrong choice under the circumstances," the government is immune from suit under the FTCA. *Id*.

**B.      Application of the Discretionary Function Exception**

Defendant asserts that the discretionary function exception to the FTCA applies to Plaintiff's claims of wrongful death and negligent infliction of emotional distress. Doc. 19-1 at 11. Defendant argues that Plaintiffs' complaint does not identify any specific statute, regulation, or policy which mandates specific action regarding hazard trees, and that in fact no hazardous tree policy at Yosemite National Park requires such action. *Id*. at 11. Instead, Defendant contends, the hazardous tree policies merely provide a framework and that Park Service personnel are accorded leeway to address hazard trees on a case-by-case basis. *Id*. at 11-12.

Defendant also argues that the management of hazard trees in Yosemite National Park is susceptible to policy analysis and therefore satisfies the second step of the *Berkovitz* test. Doc. 19-1 at 12. Specifically, Defendant contends that tree management involves policy decisions as to timing, location, manner, and regularity of tree surveys, the proper response to identified hazards, and the type of warnings to post, if any. *Id*. at 15. Likewise, Defendant maintains that tree management decisions also involve balancing safety with other policy goals, such as "resource conservation, employee safety, visitor enjoyment and experience, ecological factors, cultural factors involving Native American tribes, and budgeting and staffing." *Id*. Defendant asserts that the nature of tree management, which must take into account the aforementioned policy considerations, is of the type described in the second step of the *Berkovitz* test, and the discretionary function exemption therefore applies. *Id*.

Plaintiffs counter that the discretionary function exception does not apply to their wrongful death and negligent infliction of emotional distress claims. Doc. 21 at 3. The tortious actions which Plaintiffs allege Defendant took involve primarily operational, and not planning, decisions, Plaintiffs claim. *Id*. To the extent that the tree management decisions did involve some element of judgment, Plaintiffs argue,

those decisions are not of the sort which the discretionary function exception was designed to shield. *Id*. at 4. Rather than a criticism of Defendant's tree management plan, Plaintiffs assert that their "claims are based upon [Defendant's] blatant disregard of a known danger." *Id*. at 4. The discretionary function exemption, Plaintiffs argue, was not intended to restore immunity to the federal government when employees disregard known risks. *Id*. at 5. Moreover, Plaintiffs argue, Yosemite National Park's written plan for hazard tree management mandates abatement or mitigation for trees with a high hazard rating. *Id*. at 6.

### 1. **Applicable National Park Service Policies**

The authority for the National Park Service's management of national parks such as Yosemite is found in the Organic Act, which states that the Park Service's purpose is "to conserve the scenery, natural and historic objects, and wild life in the [National Park System] and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. § 100101(a) (amending and replacing 16 U.S.C. § 1 (repealed 2014)); *see Terbush*, 516 F.3d at 1130. The Organic Act further grants the Secretary of the Interior and the National Park Service authority to "provide for the destruction of such animals and plant life as may be detrimental to the use of any System unit." 54 U.S.C. § 100752.

The Organic Act does not specify any particular guidelines or methodology for the Secretary or the National Park Service to follow in maintaining trees or other features of the National Parks System or in evaluating which animals or plant life may be detrimental to the use of any National Park System unit. Instead, it sets out a general framework, and affords the National Park Service "discretion to design and implement a policy for evaluating and removing trees" from National Park System units. *Autery v. United States*, 992 F.2d 1523, 1528 (11th Cir. 1993) (citing *Zumwalt v. United States*, 928 F.2d 951, 954-55) (10th Cir. 1991).

Several policy documents, including the National Park Service Management Policies ("the Management Policies"), Pacific West Region Directive PW-062 ("Directive PW-062"), Yosemite

7

National Park Directive # 25 ("Directive # 25"), the Yosemite Vegetation Management Plan ("the Vegetation Management Plan"), and the 1993 Guidelines for Managing Hazardous Trees ("the 1993 Guidelines"), constitute the National Park Service's policy for hazard tree management in Yosemite National Park. Doc. 19-2 ¶ 6. The Management Policies specify that "Congress has given the [National Park Service] the management discretion to allow impacts within parks" but the National Park Service "must leave park resources and values unimpaired unless a particular law directly and specifically provides otherwise." Doc. 19-3 at 12. Park resources and values include native plants. *Id*. The National Park Service may intervene to manage native plants only in limited circumstances, including "to protect human health" and "to maintain human safety." *Id*. at 18. The Management Policies further specify that "[t]he saving of human life will take precedence over all other management actions" but "[t]he means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing." *Id*. at 20.

Directive PW-062, which addresses hazard tree management in a region which includes Yosemite National Park, indicates that "[s]urveys/inspections of tree hazards should be made on a regular periodic basis" with the frequency of surveys in each area recorded in the hazard tree plan. Doc. 19-4 at 7. "All hazard tree management programs need to have some method of objectively rating hazards" and "parks will implement a professionally recognized, documented and quantified hazard tree rating system." Doc. 19-4 at 8. Directive PW-062 does not specify that any particular rating system must be used, but lists factors which any rating system should consider and four action thresholds which a tree hazard management program must consider. *Id*. at 8-9. The action thresholds divide hazardous condition ratings as low, medium/moderate, high, and very high. *Id*. at 9. Hazardous conditions rated high require a management action, and "[h]azardous conditions rated very high require prompt actions to both notify park users and to execute abatement/mitigation measures." *Id*. However, Directive PW-062 states that parks "may consider the knowledge, experience and judgment of the park's field staff in conjunction with the numerical hazard tree rating system to determine the appropriate management response for a

8

species- and target-specific hazard." *Id*. While "[t]rees with a high or very high hazard rating will require some type of abatement/mitigation" the specific method to be used is not specified and "[p]rior to any action, a review of resource issues should be made considering the various environmental laws and the resources potentially impacted." *Id*.

Directive # 25, effective as of September 6, 2013, has as its primary purpose "the safety of the visiting public and park employees, along with conservation of park resources." Doc. 19-5 at 3. All activities in Directive # 25 "are to be undertaken to the fullest extent feasible and consistent with available resources while still providing for the safety of park operations." *Id*. Directive # 25 provides Yosemite National Park "with a framework for a hazard tree program" and explains that "[a] park hazard tree management program provides a systematic method for mitigating tree hazards." *Id*.

Directive # 25 states that "[t]he park superintendent retains discretion to administer the [park hazard tree management program] with available park staff and financial resources in the context of other legal requirements and other considerations." *Id*. at 5. Directive # 25 uses a mix of mandatory and optional language. For example, while "[i]ndividuals involved in hazard tree management . . . must be fully briefed and adequately trained" and tree inspectors "must follow defined safety standards" and "must use Personal Protective Equipment," *Id*. at 5, it leaves decisions as to the type of hazard rating system, mitigation and abatement responses, and even the need for a hazard tree management program to the park superintendent. *Id*. at 7-8, 12.

The 1993 Guidelines provide guidance on factors to consider in a hazard tree management program, particularly compliance and preservation concerns such as environmental impact and cultural and historical landscape management. Doc. 19-6 at 8-12. They also state that "[i]t is proper exercise of discretionary function for the park Superintendent . . . to determine which one of a variety of health and safety issues is most critical." Doc. 19-6 at 7. Concerns which may be taken into account in tree hazard management include "rare and endangered species or their critical habitat, impacts to visual resources or cultural landscape values, impacts to soils and hydrology, significant alteration of local natural forest

9

structure and composition, wildlife nesting or breeding periods, surface disturbance of archaeological sites, and cumulative effects from ongoing programs or extended projects" in addition to visitor experience and safety. *Id*. at 8.

The Vegetation Management Plan identifies hazard trees as an issue for vegetation management, and states that "[r]easonable and prudent measures should be taken to protect safety and property." Doc. 19-7 at 12. A vegetation management program should "provide a reasonable level of personal safety and property protection . . . while preserving and sustaining healthy trees as components of the ecosystems." *Id*. at 13. "Tree hazards will be removed using approved hazard surveillance, mitigation, abatement, and prevention techniques." *Id*. The Vegetation Management Plan states that a rating system will be used for evaluating and designating trees for removal, and all methods of tree hazard mitigation should be considered. *Id*. at 16. The priorities of the Vegetation Management Plan include "the identification, prioritization, and mitigation of tree hazards within Yosemite National Park in a safe and cost-effective manner, conserving park values, natural and cultural resource integrity, and minimizing visual, biological, and physical evidence of hazardous tree treatments." *Id*. at 20.

The fiscal year 2014 Annual Work Plan for Yosemite National Park specified that campgrounds and picnic areas were to be surveyed and hazard reductions completed between January and April. Doc. 19-9 at 2. The fiscal year 2015 Work Plan indicated that work in the Upper Pines Campground, where the Subject Tree was located, would be completed in January and February. Doc. 19-8 at 2.

### 2. <u>Step One of the *Berkovitz* Test</u>

At step one of the *Berkovitz* test, the Court must determine whether the challenged conduct "involve[d] an element of judgment or choice." *Terbush*, 516 F.3d at 1129. To determine whether the discretionary function exception applies to a challenged governmental action, a court must undertake "a particularized analysis of the specific agency action challenged." *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014). Therefore, the Court must identify the challenged agency action before it may determine whether that conduct involved "an element of judgment or choice." Plaintiffs' claims are

premised on the assertion that Defendant was negligent in maintaining and managing the Subject Tree and the area around it, leading to the establishment of an unsafe area. Doc. 1 at ¶¶ 28, 42. In particular, Plaintiffs argue that Defendant "failed to use reasonable care in keeping the subject premises in a reasonably safe condition, . . . that Defendant[] failed to use reasonable care to discover any unsafe conditions and to repair, replace, or give adequate warning to anything that could be reasonable expected to harm others" and Defendant knew or should have known about the condition of the Subject Tree. *Id*. at ¶¶ 33-34. In essence, Plaintiffs argue that Defendant's management of the Subject Tree, and the area immediately around it, gives rise to their claims.

The National Park Service and Yosemite National Park policies, guidelines, and work plans offered by Defendant indicate that the National Park Service and the park superintendents are responsible for inspecting trees and for formulating and carrying out appropriate responses to hazards. They do not, however, establish any specific rules regarding timing of inspections, evaluation criteria, or mitigation and abatement techniques, though they do suggest a number of possible options. The National Park Service instead has discretion to formulate an appropriate means of identifying and responding to tree hazards in Yosemite National Park.

Plaintiffs do not dispute that the relevant policies and guidelines do not set forth a specific method for identifying and responding to tree hazards, but argue that the statement in Directive # 25 that "[t]rees with a high or very high hazard rating will require some type of abatement/mitigation" establishes that some response is mandatory once a sufficiently severe tree hazard is identified. Doc. 21 at 6.That is to say, Plaintiff's position is that Defendant may not "ignore visible hazards that pose a risk to human lives." *Id*. This is the only source of a mandatory duty Plaintiffs identify.

Plaintiff's argument ultimately does not hold weight. Plaintiffs have not offered any evidence that Defendant in fact rated or should have rated the Subject Tree as a high or very high hazard. Plaintiffs offer the declaration of Jim Clark, a specialist in tree risk assessment, who states that he would

have rated the Subject Tree as a high hazard based on the Subject Tree's codominant stem[1] nature, the previous failure of one of the codominant stems, the presence of saprophytic fungi on the previously failed stem, and the poor structure of the stem which fell on August 14, 2015. Doc. 21-1 at ¶ 14-15. The seven point system which Mr. Clark applied was not a mandatory system applied in Yosemite National Park, but only one suggested approach for rating hazard trees. The various policies and guidelines which address tree hazard ratings in Yosemite National Park vest considerable discretion in park staff to determine the level of hazard posed by vegetation in the park. For example, Directive PW-062 states that a park may apply "the knowledge, experience and judgment of the park's field staff in conjunction with the numerical hazard rating system to determine the appropriate management response" to a hazard tree. Doc. 19-4 at 8. Whether park staff failed to sufficiently inspect the Subject Tree or rate it at the proper hazard level goes to the merits of Plaintiffs' negligence claim, not whether Defendant had discretion to determine how to manage hazard trees in Yosemite National Park. "At step one of the discretionary-function-exception analysis, all that matters is that there was, in fact, discretion." *Chadd v. United States*, 794 F.3d 1104, 1111 (9th Cir. 2015). Moreover, the policies and guidelines do not mandate any specific type of abatement or mitigation even if a tree is determined to pose a high or very high hazard. The documents present instead a non-exclusive list of optional responses. *See* Doc. 19-4 at 9.

Taken as a whole, the policies afford the National Park Service considerable discretion in addressing hazard trees, which is not negated by the presence of some mandatory language. *See Miller v. United States*, 163 F.3d 591, 595 (9th Cir. 1998) (discretionary function exception applied where standards for fighting forest fires "outline[d] certain requirements" but did not "tell the Forest Service to suppress the fire in a specific manner and within a specific period of time"). The broad functions of

---

[1] According to Mr. Clark, the Subject Tree displayed "codominant stems that form a "V" shape." Doc. 21-1 at ¶ 8. "Codominant stems fail at a much higher rate than a single stem. A 'V-shaped' union is much more likely to fail than a 'U-shaped' union." *Id*. at ¶ 9.

hazard tree management, which concern balancing safety, budgetary, and conservation goals, "necessarily involve[s] an element of discretion." *Id*. Accordingly, having found no specific mandatory tree hazard management protocol which displaces the element of discretion afforded to the National Park Service in Yosemite, the Court concludes that Defendant has met its burden at the first step of the *Berkovitz* test.

### 3. Step Two of the *Berkovitz* Test

Once a court has concluded that the challenged governmental action is discretionary in nature, the court must next consider whether the discretion left to the government "is of the kind that the discretionary function exception was designed to shield." *Bailey*, 623 F.3d at 860. The challenged action "need not be actually grounded in policy considerations, but must be, by its nature, susceptible to a policy analysis." *Miller*, 163 F.3d at 593. There is "a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Gaubert*, 499 U.S. at 324.

The Ninth Circuit recognizes a "design-implementation distinction" in the application of the discretionary function exception. *Gonzalez v. United States*, 814 F.3d 1022, 1034 (9th Cir. 2016). This distinction recognizes that, at step two of the *Berkovitz* test, "the *design* of a course of governmental action is shielded by the discretionary function exception, whereas the *implementation* of that course of action is not." *Whisnant v. United States*, 400 F.3d 1177, 1181 (9th Cir. 2005) (emphasis in original). When the implementation itself implicates policy concerns, however, the implementation is shielded by the discretionary function exception. *Chadd*, 794 F.3d at 1112.

The Court concludes that Defendant has met its burden at step two. In addition to the "strong presumption" that the challenged conduct involved policy considerations, the policies and guidelines for hazard tree management in Yosemite National Park offered by Defendant evidence the need to consider broad policy concerns in managing hazard trees. For example, Directive PW-062 mandates that, before taking any particular action to address a hazard tree, "a review of resources should be made considering

the various environmental laws and the resources potentially impacted." Doc. 19-4 at 9. Likewise, the 1993 Guidelines list a number of special concerns which may be taken into account when managing tree hazards, including environmental, cultural, and archaeological impacts as well as visitor safety and experience. Doc. 19-6 at 8. These policy concerns are the type of decisions protected by the discretionary function exception.[2] *See Chadd*, 794 F.3d at 1112 ("[A]t step two of the discretionary-function-exception analysis, where there is even *one* policy reason why officials may decide not to take a particular course of action to address a safety concern, the exception applies.").

Plaintiffs have not offered any evidence to rebut either the "strong presumption" or the applicability of the specific policies and guidelines relied upon by Defendant. In arguing that the challenged conduct is not protected by the discretionary function exception because Defendant disregarded a known risk in implementing tree hazard management policy, Doc. 21 at 6, Plaintiffs ignore the recognized principle that "implementation of a government policy is shielded where the implementation itself implicates policy concerns." *Whisnant*, 400 F.3d at 1182 n. 3. Even where a condition presents a known danger, so long as the implementing decision itself is susceptible to a policy analysis it falls within the discretionary function exception. *Chadd*, 794 F.3d at 1113-14 (holding that Park officials decision not to exterminate non-native, non-endangered mountain goats fell within the discretionary function exception even though the goats presented a known risk to park visitors); *see also Valdez v. United States*, 56 F.3d 1177, 1180 (9th Cir. 1995) (the discretionary function exception protects "a choice between the competing policy considerations of maximizing access to and preservation of natural resources versus the need to minimize potential safety hazards").

Plaintiffs have offered no evidence that the challenged conduct was based on technical,

---

[2] While budgetary considerations are not protected by the discretionary function exception, *Bolt v. United States*, 509 F.3d 1028, 1034 (9th Cir. 2007), the conduct here also involved weighing conservation, safety, environmental, and other policy concerns.

objective, or scientific standards which would make them not susceptible to policy analysis. *See Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1030 (9th Cir. 1989) ("[D]ecisions involving the 'application of objective scientific standards'—such as how much dynamite to use to produce a refraction—are not insulated by the discretionary function exception because they do not involve the weighing of economic, political and social policy considerations.") (quoting *Berkovitz*, 486 U.S. at 545). Nor have Plaintiffs argued that the challenged conduct was in fact not based on a consideration of policy. For the foregoing reasons, the Court concludes that Defendant has met its burden to satisfy the second step of the *Berkovitz* test. Therefore, the challenged conduct is subject to the discretionary function exception, and the Court lacks subject matter jurisdiction over this matter.

**C.      Plaintiffs' Request for Discovery**

Plaintiffs request that they be permitted to conduct discovery relating to the prior failure of one stem of the Subject Tree before the Court rules on Defendant's motion to dismiss. Doc. 21 at 12. The Court "is vested with broad discretion to permit or deny discovery. *Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). "Refusal to grant discovery to establish jurisdiction is not an abuse of discretion when 'it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction'" *Id*. (quoting *Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n. 24 (9th Cir. 1977)).

Here, the application of the discretionary function exception turns on whether the National Park Service has discretion in deciding how to evaluate and respond to tree hazards, and whether its decision regarding the Subject Tree is susceptible to a policy analysis. Plaintiffs' proposed discovery regarding previous failures of the Subject Tree might be pertinent to establishing negligence, but would not weigh on either step of the *Berkovitz* test. Even if the National Park Service was aware of a previous stem failure by the Subject Tree, it would still have discretion in evaluating and responding to that information under the relevant policies and guidelines. Since the proposed discovery would not impact whether the Court has jurisdiction in this matter, Plaintiff's request for discovery is DENIED.

## VI. CONCLUSION AND ORDER

The events which occurred in Yosemite National Park are tragic and devastating. While it is unlikely that Plaintiffs will be able to establish the Court's subject matter jurisdiction over this action, in an abundance of caution Plaintiffs are granted leave to amend their complaint. This will be Plaintiffs' only chance to amend their complaint. For the foregoing reasons, Defendant's motion to dismiss is GRANTED and Plaintiffs' complaint is dismissed with leave to amend. Plaintiffs shall file any amended complaint within 30 days of this order.

IT IS SO ORDERED.

Dated: **June 15, 2017**          /s/ Lawrence J. O'Neill
                                              UNITED STATES CHIEF DISTRICT JUDGE